H. Duane DeMENT, et al., Plaintiffs,

v.

ABBOTT CAPITAL CORP., et al., Defendants.

No. 81 C 2887.

United States District Court, N.D. Illinois, E.D.

June 15, 1984.

Gary M. Elden, Daniel A. Edelman, Joyce L. Logan, Reuben & Proctor, Chicago, Ill., for plaintiffs.

Michael P. Connelly, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

According to the complaint in this action, Eagle Monitoring Systems ("Eagle"), a business that designed systems to monitor complex machinery, began as a partnership between plaintiffs H. Duane DeMent and Keith Kopp in 1971. Being inexperienced in business matters, they sought management and financial advice from defendant Richard E. Lassar and his firm, Richard E. Lassar & Associates ("Lassar & Associates"). In 1973, Lassar advised plaintiffs to incorporate. Plaintiffs did so and sold 6⅔% of the Eagle stock to Lassar for $10,000 and 6⅔% to a friend of Lassar for another $10,000. There is no allegation that this sale was tainted by fraud. Eagle entered into an agreement with Lassar for the payment of a monthly retainer and

finder's fee for any financing Lassar obtained for Eagle.

Eagle incorporated on Lassar's advice in 1973. As it expanded, its need for financing grew; Lassar suggested that Eagle seek financing from small business investment companies ("SBICs"). Lassar arranged a loan by several SBICs including defendant Abbott Capital Corp. ("Abbott"). Under the proposed loan, the SBICs were to loan Eagle $100,000. Eagle was to grant the lenders warrants exercisable for five years or the life of the loan for 25 to 50% of Eagle's stock. The proposed agreement also imposed several restrictive covenants. According to plaintiffs, Lassar deliberately delayed the closing of the loan, though he knew Eagle's financial situation was precarious. In addition, plaintiffs allege, Lassar did not disclose to them that he was affiliated with several of the lenders, including Abbott.

At the scheduled closing of the loan, Commerce Capital Corp., another SBIC and a defendant here, objected to the agreement and insisted on additional consideration. Plaintiffs claim that this was planned in advance with an associate of Lassar as a means of coercing Eagle to give up more in return for the loan.

Because of their desperate need for financing, plaintiffs allege, they had no alternative but to accept the additional terms proposed by Commerce Capital. Lassar and Abbott added still more terms before the next closing, including an eight-year management contract between Abbott and Eagle for $4800 per year (which plaintiffs claim was a sham covering a fee that actually went to Lassar in violation of Small Business Administration regulations), more restrictive covenants, a personal guaranty of the loan by DeMent and Kopp, and a requirement that the lenders be permitted to exercise their warrants for a price based on a net worth test. Lassar, still operating under the alleged undisclosed conflict of interest, advised plaintiffs to accept the loan because there was no alternative, and plaintiffs agreed.

The rescheduled closing took place in June 1974; at that time, two more terms were added, including a term that allegedly had the effect of permitting the lenders to exercise the warrants at an extremely low cost. Plaintiffs claim that they did not comprehend the significance of the term but assented to it on Lassar's advice.

Eagle performed its obligations under the loan agreement until April 1981, though it claims that Abbott did not provide it with the management services it had contracted to provide. In April 1981, Eagle agreed to sell its assets to another company, TRW, for $3.2 million in cash and TRW's assumption of Eagle's operating liabilities. The lenders then elected to exercise their warrants and tendered $240 for 25% of Eagle's stock. In light of the TRW proposal, the stock was actually worth $800,000.[1] Plaintiffs claim that the $240 price relied on by the lenders was not the correct price for exercise of the warrants. Eagle refused to honor the warrants, and the proceeds from the TRW acquisition were placed in trust. Eagle commenced this action at or about the same time.

Plaintiffs' amended complaint is stated in nine counts and alleges violations of various federal and Illinois statutes, common law torts, and breaches of contract. Defendants have moved for summary judgment on counts 1 and 3. Count 1 arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68 (1982); count 3 arises under §§ 12 F & I of the Illinois Securities Act, Ill.Rev.Stat. ch. 121½, §§ 137.12 F, I (1983).

## RICO

For civil liability to exist under RICO, plaintiffs must show that a defendant or defendants acquired or maintained an interest or control in an enterprise through a

---

**1.** According to plaintiffs, TRW had previously offered to purchase Eagle in 1978 for 70,000 shares of TRW stock, which then sold for $60 per share. The deal was never consummated, allegedly because TRW was concerned that the warrants held by the SBICs would create problems after the acquisition, and because TRW believed that Eagle lacked the management services that Abbott and Lassar were supposed to provide.

pattern of racketeering activity, 18 U.S.C. § 1962(b), participated in the conduct of an enterprise through a pattern of racketeering activity, *id.* § 1962(c), or conspired to violate the other provisions of § 1962, *see id.* § 1962(d). "Pattern of racketeering activity" is defined as the commission of at least two criminal acts of the type listed in *id.* § 1961(1). *See id.* § 1961(5). Here plaintiffs allege that defendants' activities were respect to plaintiffs and other small businesses amounted to violations of the federal mail fraud and wire fraud statutes. 18 U.S.C. §§ 1341, 1343 (1982). The relief plaintiffs seek for the RICO violation is as follows:

    a. An order pursuant to 18 U.S.C. § 1961(a) preventing and restraining defendants from committing further violations of 18 U.S.C. § 1962, and ordering them to divest themselves of any purported interest in EMS Liquidating Corporation [which was formed after the sale of Eagle's assets to TR];

    b. Awarding EMS Liquidating Corporation three times the actual damages it has sustained as a result of defendants' unlawful conduct, which damages include:

        i. All excessive interest paid lenders pursuant to the Abbott Loan Agreement;

        ii. All management fees paid Abbott pursuant to the Abbott Loan Agreement;

        iii. All director's fees paid Abbott pursuant to the Abbott Loan Agreement;

        iv. All consulting fees paid Lassar & Associates and/or Lassar individually, at any time; and

        v. Any and all existing or potential equity lost by Eagle pursuant to lenders' exercise or attempted exercise of their warrants;

    c. [C]osts, including reasonable attorney's fees; and

    d. Such other relief as the Court may deem just.

Amended Complaint ¶ 71.

Defendants' argument with respect to plaintiffs' RICO claim is that plaintiffs seek relief that is equitable in nature and that equitable relief is not available to a private RICO plaintiff. The only reported decision directly discussing this issue at any length is *Kaushal v. State Bank of India*, 556 F.Supp. 576 (N.D.Ill.1983), in which our colleague Judge Milton Shadur concluded that the equitable remedies of injunction and divestiture were not available to a private RICO plaintiff. Defendants urge us to follow *Kaushal*.

As we have noted, defendants argue (1) that plaintiff seek equitable relief, and (2) that a private RICO plaintiff is not entitled to equitable relief. Plaintiffs have responded only to the first part of defendants' argument, claiming that the relief they seek is not equitable. They state in their brief that they disagree with defendants' assertion as to the availability of equitable relief, but they do not argue the point, stating only that they "will address that question if the Court desires." Response to Motion for Partial Summary Judgment at 6. As far as we are concerned, plaintiffs have made their election. We see no need for another round of briefs. Plaintiffs had an opportunity to address all the arguments advanced by defendants, and they have chosen to address only some of them. The question of the availability of equitable relief to a private RICO plaintiff is before us.

### 1. *Paragraph 71(a)*

■ Paragraph 71(a) of the amended complaint clearly seeks equitable relief in part; plaintiffs ask for an order restraining defendants from committing further RICO violations. In their response to the motion for summary judgment, at page 5 n. *, plaintiffs state that this is moot. We will take them at their word, and the first part of ¶ 71(a) is therefore stricken.

The remainder of ¶ 71(a) also seeks relief in the form of a mandatory injunction: plaintiffs ask us to order defendants to divest themselves of any purported interest in EMS Liquidating Corporation. It is un-

clear whether plaintiffs' suggestion of mootness applies to this part of ¶ 71(a) as well. Certainly the last part of ¶ 71(a) has not been mooted by factual developments in the case; presumably defendants still hold the warrants, which constitute an "interest" of sorts in EMS. It also appears from the parties' trial briefs that some of the defendants had become shareholders in Eagle even before the Abbott loan agreement was concluded. It may be that plaintiffs seek divestiture of this interest too. An order of divestiture is generally considered an equitable remedy. *See United States v. Cappetto*, 502 F.2d 1351 (7th Cir. 1974) (criminal RICO case), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975). Thus, the relief sought in ¶ 71(a) appears to be injunctive in nature, and if a private RICO plaintiff cannot obtain an injunction under the statute, ¶ 71(a) should be stricken.

Judge Shadur's opinion in *Kaushal v. State Bank of India* sets forth most of the arguments on both sides of the injunctive/equitable relief issue. The "relief" portion of RICO, 18 U.S.C. § 1964 (1982), provides as follows:

(a) The district courts of the United States shall have jurisdiction to prevent and restrain violation of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

(b) The Attorney General may institute proceedings under this section. In any action brought by the United States under this section, the court shall proceed as soon as practicable to the hearing and determination thereof. Pending final determination thereof, the court may at any time enter such restraining orders or prohibitions, or take other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper.

(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

(d) A final judgment or decree rendered in favor of the United States in any criminal proceeding brought by the United States under this chapter shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding brought by the United States.

18 U.S.C. § 1964(a)–(d) (1982).

Some commentators have argued that the use of "and shall" in § 1964(c) rather than "to" before the treble damages recovery clause implies that the private damages remedy is in addition to other remedies, including equitable relief. *See* Blakey & Gettings, Racketeer Influenced and Corrupt Organizations (RICO): Basic Concepts—Criminal and Civil Remedies, 53 Temple L.Q. 1009, 1038 & n. 133 (1980). However, the Supreme Court twice construed provisions of the original Sherman Act that were nearly identical to § 1962(a) & (c) not to permit a private antitrust plaintiff to obtain injunctive relief. *See Minnesota v. Northern Securities Co.*, 194 U.S. 48, 24 S.Ct. 598, 48 L.Ed. 870 (1904); *Paine Lumber Co. v. Neal*, 244 U.S. 459, 37 S.Ct. 718, 61 L.Ed. 1256 (1917).[2] Section 16 of the Clayton Act, 15 U.S.C. § 26 (1982), expressly provided for private injunctive relief to overcome *Northern Securities*. *See* A. Bridges, Private RICO Litigation Based Upon "Fraud in the Sale of Securities," 18

---

**2.** *Kaushal* did not address these cases, but it did note that the current antitrust law contains the "and shall recover" language in a section separate from that specifically authorizing private injunctive relief, a section not contained in RICO. *Kaushal*, 556 F.Supp. at 583 & n. 22.

Ga.L.Rev. 43, 74–75 (1983). Had Congress intended a private RICO plaintiff to be able to obtain injunctive relief, it surely would have avoided language that had previously been held by the Supreme Court not to permit such relief.

Further, as Judge Shadur points out, the Senate bill that was the initial RICO proposal, S. 30, 91st Cong., 1st Sess. (1969), did not contain a private right of action at all, and the committee report discussed only civil RICO actions by the United States. S.Rep. No. 617, 91st Cong., 1st Sess. 24, 34, 80–83, 160 (1969). The Senate bill was amended in committee in the House to add a private treble damages remedy. H.R. Rep. No. 1549, 91st Cong., 2d Sess. 35, 58 *reprinted in* 1970 U.S.Code Cong. & Admin.News 4007, 4010, 4034. Thus, as originally written, § 1964(a) conferred jurisdiction on the courts, and § 1964(b) defined who could invoke it. Section 1964(c) appears independent of § 1964(a). "[T]he House Committee's addition of the private damages remedy had not altered the public-action thrust of the other subsection of S. 30 § 1964." *Kaushal,* 556 F.Supp. at 583.

Finally, and perhaps most persuasively, a proposed amendment to RICO that would have added an express right to injunctive relief for private plaintiffs was turned away on the floor of the House. In responding to the proposed amendment, one of the managers of the bill in the House stated that

> [the proposed amendment] does offer an *additional civil remedy* which I think properly might be suited to the special mechanism fashioned in title IV .... It has its counterpart almost *in haec verba* in the antitrust statutes, and yet I suggest to [Rep. Steiger] that prudence would dictate that the Judiciary Committee very carefully explore the potential consequences that *this new remedy* might have. ... I would hope that the gentleman might agree to ... withdraw his amendment from consideration with

the understanding that it might properly be considered by the Judiciary Committee when the Congress reconvenes following the elections or some other appropriate time.

116 Cong.Rec. 35,346 (daily ed. Oct. 7, 1970) (remarks of Rep. Poff) (emphasis supplied), *quoted in* A. Bridges, Private RICO Litigation Based Upon "Fraud in the Sale of Securities," 18 Ga.L.Rev. 43, 75–76 (1983). Such an amendment was never considered again. Bridges, *supra* at 76. This discussion indicates that those sponsoring the bill viewed injunctive relief as a remedy in addition to that provided by § 1964(c) as ultimately passed.

As Judge Shadur pointed out in *Kaushal,* under *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979), where a statute expressly provides a particular remedy or remedies, a court should be reluctant to read others into it. Further, a court may read additional judicial remedies into "elaborate [statutory] enforcement provisions" only where "strong indicia of a contrary congressional intent" negate the implication that "Congress provided precisely the remedies it considered appropriate." *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 14–15, 101 S.Ct. 2615, 2623–2624, 69 L.Ed.2d 435 (1981). Here, not only is there no indication of congressional intent to provide for private injunctive relief, there is in fact strong indication that the contrary was intended. Under *Transamerica Mortgage* and *Sea Clammers,* therefore, a private RICO plaintiff should not be able to obtain an injunction. This means that the injunction and divestiture remedies sought by plaintiffs in ¶ 71(a) of the amended complaint are not available.[3] That subparagraph is therefore stricken.

### 2. *Paragraph 71(b)*

Paragraph 71(b) of the amended complaint in essence seeks return of the "ex-

---

**3.** We do not reach the issue whether preliminary injunctive relief would be available to a private RICO plaintiff in extraordinary circumstances, such as where necessary to prevent a disposition or dissipation of assets pending a final money judgment.

cessive" consideration allegedly paid to defendants, as well as the sums lost due to defendants' exercise of the warrants. Defendants characterize this as an equitable remedy.

■ Return of out of pocket losses is generally the appropriate remedy for fraud, a common law tort that is somewhat analogous to the RICO violation claimed here. *See Smith v. Bolles,* 132 U.S. 125, 129–30, 10 S.Ct. 39, 40–41, 33 L.Ed. 279 (1889); *Madigan, Inc. v. Goodman,* 498 F.2d 233, 239 (7th Cir.1974) (securities fraud action). Defendants suggest that what plaintiffs seek is in reality rescission and restitution, which defendants characterize as an equitable remedy. However, even before the merger of law and equity, a plaintiff could obtain such relief at law. *See* 1 G. Palmer, Law of Restitution § 3.7 at 260, § 3.16(b) at 328–29 (1978); 5 J. Moore, Moore's Federal Practice ¶ 38.23 at 38–188 (1982); W. Prosser, Law of Torts §§ 94, 105, 110 (1971). *See also Myzel v. Fields,* 386 F.2d 718, 741 (8th Cir.1967) (characterizing relief as legal, not equitable), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); *Equitable Life & Casualty Insurance Co. v. Lee,* 310 F.2d 262, 266–67 (9th Cir.1962) (same). Thus, to the extent plaintiffs seek return of "excess" consideration paid to defendants due to fraud or breach of fiduciary duty, the relief they seek is not equitable in nature.

On the other hand, as defendants point out, to the extent plaintiffs seek to deny defendants the sums defendants claim are owed them due to their exercise of the warrants, it is possible to characterize the remedy sought as cancellation of the warrants. Cancellation is an equitable remedy. *See Roberts v. Sears, Roebuck & Co.,* 617 F.2d 460, 464 (7th Cir.), *cert. denied,* 449 U.S. 975, 101 S.Ct. 386, 66 L.Ed.2d 237 (1980). However, in the present posture of the parties' relationship, it is also possible to characterize the relief sought as a return of the value of the consideration paid defendants for the Abbott loan. In other words, one could in essence permit defendants to exercise the warrants, which would entitle them to a share of the funds in trust, but then provide that the value obtained that is attributable to their fraud must be returned to plaintiffs. Such relief would not be equitable in nature.[4]

Even if plaintiffs' requested relief must be characterized as "equitable" rescission, that does not necessarily end matters. The opinions the address the availability of "equitable" relief under RICO in a private lawsuit all concern, with one exception, relief that is injunctive in nature. *See Trane Co. v. O'Connor Securities,* 718 F.2d 26, 28 (2d Cir.1983) (preliminary injunction; characterizing issue as whether private plaintiff can obtain "injunctive" relief); *Dan River, Inc. v. Icahn,* 701 F.2d 278, 290 (4th Cir.1983) (preliminary injunction); *Aetna Casualty & Surety Co. v. Liebowitz,* 570 F.Supp. 908, 910–11 (E.D.N.Y.1983) (preliminary injunction), *aff'd,* 730 F.2d 905 (2d Cir.1984); *Kaushal,* 556 F.Supp. at 581–84 (divestiture and blocking of sale of business); *Ashland Oil, Inc. v. Gleave,* 540 F.Supp. 81, 84–86 (W.D.N.Y.1982) (attachment). *But see Car Carriers, Inc. v. Ford Motor Co.,* 583 F.Supp. 221 (N.D.Ill.1984) (rescission) (dictum).

■ That an injunction is not available to a private RICO plaintiff does not mean that relief that consists of a monetary payment is also barred, even if it is characterized as "equitable." The type of relief described in § 1964(a) & (b) is the traditional coercive form of injunctive or equitable relief: divestiture, injunction against participating in a business, dissolution, reorganization, and the like. That Congress did not intend for a private party to obtain such drastic forms of relief does not mean that it intended to bar a private party from *compensation* for harm done due to a RICO violation merely because the relief is characterized as "equitable". We there-

---

**4.** That the funds happen to be held in trust at present does not affect matters. We would not be "ordering" the trustee to pay to one party or another but rather permitting one or the other party to receive the funds held in trust.

fore hold that even if ¶ 71(b) consists of equitable restitution, it describes a form of relief available to a private RICO plaintiff.[5] The relief described in ¶ 71(b) is therefore proper in the present action.

### 3. *Other relief.*

In response to the motion for summary judgment, plaintiffs pointed out that some of the relief they seek clearly is not equitable in nature. In particular, plaintiffs seek damages for defendants' alleged thwarting of the proposed sale of Eagle to TRW in 1978, *see* n. 1 *supra,* and infliction of injury to Eagle's business by the allegedly unreasonable restrictions imposed upon it by Abbott and the other lenders. *See* Response to Motion for Partial Summary Judgment at 6; Plaintiffs' Trial Brief at 43–44, 46–47. Defendants' reply to this assertion was twofold: that defendants did not thwart or impede the proposed TRW sale, and that plaintiffs' requested damages are speculative as a matter of law. This prompted a motion by plaintiffs to strike what they termed the new factual material in defendants' reply or alternatively to permit plaintiffs to respond to it.

■ We agree with plaintiffs that defendants' argument that they did not thwart the TRW deal is factual in nature; it is based on citations to deposition testimony and documents. It is therefore out of place in the present motion, which was based entirely on the purported legal insufficiency of plaintiffs' RICO claim. In any event, defendants' argument appears insufficient to warrant striking the TRW damage claim at this stage of the litigation. Defendants' factual argument is that TRW did not view the lenders' warrants as a barrier to the 1978 sale, and that defendants were willing to convert the warrants to stock in order to deal with any concern of TRW. This does not appear to deal with the full scope of plaintiffs' claim. Plain-

tiffs' claim includes the assertion that another barrier to the sale was the fact that the restrictive covenants imposed by Abbott and the other lenders would continue even after the sale, thus limiting the scope of Eagle's business. *See* Motion Regarding New Matter Raised in Defendants' Reply at 3. Thus, plaintiffs' TRW claim would appear to survive defendants' argument of factual insufficiency.

■ Defendants' second argument is not a factual argument; rather, it is a response invited by plaintiffs' reliance on the thwarted TRW deal to avoid defendants' argument that a private RICO plaintiff cannot obtain equitable relief. In light of our previous disposition of defendants' motion with respect to ¶ 71(b) of the amended complaint, plaintiffs do not "need" to rely on the TRW damages to keep their RICO claim alive. However, it may nonetheless be the case that the damages plaintiffs seek for that claim cannot be recovered under RICO. We will therefore address defendants' legal argument.

The cases defendants cite in support of their argument are securities fraud cases in which the courts held that the defrauded plaintiff is limited to recovery of out-of-pocket losses and cannot recover the expected profits he might have gained absent the fraud. *See Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 303 F.2d 527, 533 (10th Cir. 1962); *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,* 378 F.Supp. 112, 129 & n. 30 (S.D.N.Y.1974). We are not persuaded by defendants' implicit suggestion that the measure of damages under the securities fraud laws also applies under RICO. One must bear in mind that the above cases, which arose under 15 U.S.C. § 78j(b) (1982) and 17 C.F.R. § 240.10b–5 (1983), involved a judicially-created right of action not expressly provided for by Con-

**5.** In *Car Carriers, Inc. v. Ford Motor Co.,* 583 F.Supp. 221 (N.D.Ill.1984), Judge Shadur addressed a RICO claim in which "equitable rescission" of a lease was sought. *Id.* at 227. Though other grounds for dismissal existed thus obviating the need to address the availability of such a

remedy under RICO, Judge Shadur suggested that were he called upon to do so, he would hold that *Kaushal* applied to equitable rescission as well. *Id.* To the extent that Judge Shadur's *dictum* in *Car Carriers* conflicts with what we state above, we respectfully disagree.

gress. In the present case, § 1964(c) expressly grants a private plaintiff the right to sue for damages caused by a RICO violation,[6] and defines the proper recovery broadly: "[a]ny person injured ... by reason of a violation of this chapter ... shall recover threefold the damages he sustains ...." If the "damages sustained" by a victim of a RICO violation include lost profits, we see no bar in the statute to recovery of those losses. Of course, recovery of lost profits should be subject to the ordinary limitations concerning remoteness (or proximate cause) and speculativeness (or certainty), but on the present record we cannot say that the damages sought here are so remote from the wrongdoing or speculative and uncertain that they are unrecoverable as a matter of law. It will, of course, be up to plaintiffs to prove at trial their entitlement to damages.

## ILLINOIS SECURITIES ACT

■ Count 3 is brought pursuant to the Illinois Securities Act, Ill.Rev.Stat. ch. 121½, §§ 137.1–137.16 (1983). Plaintiffs claim that defendants' conduct violated *id.* § 137.12 F & I, which provide that it violates the Act for any person to defraud another in connection with the purchase or sale of a security. The only private right of action expressly provided in the Act is contained in *id.* § 137.13, which provides that a purchaser may rescind a sale of a security made in violation of the Act. Plaintiffs, of course, are not purchasers; they sold securities to defendants. However, they seek rescission and an award of damages due to defendants' alleged misconduct. Amended Complaint ¶ 83. Defendants argue that this is beyond that is contemplated by the Illinois Act.

Plaintiffs' response is that we should imply a damages remedy under the Act for a defrauded seller, even though no remedy at all is provided for sellers and no damage remedy is expressly provided even for purchasers. The only case under the Act on which plaintiffs rely is *Anvil Investment*

Co. v. Thornhill Condominiums, Ltd., 85 Ill.App.3d 1108, 41 Ill.Dec. 147, 407 N.E.2d 645 (1st Dist.1980), in which the court approved an award to a purchaser of securities of *punitive* (not compensatory) damages against two persons who had violated a prohibition contained in § 137.12. Plaintiffs also rely generally on *Sawyer Realty Group, Inc. v. Jarvis Corp.*, 89 Ill.2d 379, 59 Ill.Dec. 905, 432 N.E.2d 849 (1982), in which the Illinois Supreme Court discussed when a private remedy should be inferred from a statute that does not expressly provide for one. In *Sawyer*, the court stated that where a statute is enacted to protect a particular class of individuals, courts may imply a private cause of action for a violation of the statute even though no express remedy has been provided by the legislature. *Id.* at 386, 59 Ill.Dec. 908, 432 N.E.2d 852. The court noted that Illinois courts appear to be more willing to permit private remedies where none are expressly provided than are the federal courts. *Id.* at 389, 59 Ill.Dec. at 909, 432 N.E.2d at 853. The court stated that

> [i]t is clear that it is not necessary to show a specific legislative intent to create a private right of action. If there is no indication that the remedies available are only those the legislature expressed in the Act, then where it is consistent with the underlying purpose of the Act and necessary to achieve the aim of the legislation, a private right of action can be implied.

*Id.* at 386, 59 Ill.Dec. at 908, 432 N.E.2d at 852. In *Sawyer*, the existence of other express remedies, including a private right of injunctive relief, governmental enforcement, and an express private remedy for limited compensatory damages did not lead the court to hold that the remedies expressly provided were the sole remedies available. Thus, the Illinois Supreme Court does not appear to follow *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19, 100 S.Ct. 242, 247, 62 L.Ed.2d 146

---

**6.** We do not hold to the view that a RICO plaintiff must show damages amounting to "racketeering enterprise injury" or the like. We have previously rejected that view. *Addis v. Moser*, No. 83 C 6118 (N.D.Ill. Feb. 15, 1984).

(1979), which was cited in *Sawyer*, in which the United States Supreme Court held that the existence of some express remedies was evidence of legislative intent to preclude other remedies.

The Seventh Circuit has cautioned the district courts that when we interpret state law, it is not our role "to effect dramatic innovation in that body of law." *Murphy v. White Hen Pantry Co.*, 691 F.2d 350, 355 (7th Cir.1982). The pertinent provisions of the Illinois Securities Act have been in existence since 1953, and no Illinois court has ever held in a reported decision that a seller of securities is entitled to pursue private remedies under the Act. In addition, since the anti-fraud prohibitions of the Illinois Act are paralleled in the federal securities laws, particularly 15 U.S.C. § 78j(b) (1982), upon which plaintiffs rely in count 2 and which unquestionably provides for a private cause of action for rescission or damages, we do not think it prudent in the present action to add to the remedies provided by the Illinois legislature, in the absence of more specific direction from the Illinois courts.[7] For this reason, count 3 of the amended complaint is dismissed. We will enter judgment on count 3 after all claims have been disposed of. Fed.R.Civ.P. 54(b).

To summarize, defendants' motion for summary judgment is granted in part and denied in part. Paragraph 71(a) of the amended complaint is stricken, and count 3 is dismissed; defendants' motion is otherwise denied.

June 15, 1984.

---

**7.** We note that *Anvil Investment*, which upheld an award of punitive damages to a purchaser defrauded in violation of the Illinois Act, relied solely on *federal* case authority for the proposition that awards of punitive damages may be made under a statute absent specific legislative authorization. 85 Ill.App.3d at 1116, 41 Ill.Dec. at 155, 407 N.E.2d at 653. Further, the court seemingly disregarded a federal decision from which it quoted extensively, which held that punitive damages were unavailable under the federal statute parallel to the provision of the Illinois Act at issue in *Anvil*. *Id.* (citing *Globus v. Law Research Service, Inc.* 418 F.2d 1276 (2d Cir.1969)).